# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 18-CR-0128-CVE-1** |
| | ) | **(20-CV-0202-CVE-CDL)** |
| DAROWE JUNIOR JONES, | ) | |
| a/k/a Darowe Jones, Jr., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court are defendant's motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 (Dkt. # 206); defendant's brief in support of his § 2255 motion (Dkt. # 207); plaintiff's response in opposition to defendant's § 2255 motion (Dkt. # 210); defendant's reply (Dkt. # 213); defendant's first motion to amend (Dkt. # 218); defendant's motion for leave to expand the record (Dkt. # 220); plaintiff's response in opposition to defendant's motion to amend and motion to expand the record (Dkt. # 222); defendant's reply to plaintiff's response in opposition (Dkt. # 223); and defendant's second motion to amend (Dkt. # 224).  Under 28 U.S.C. § 2255, "a prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence."

In his motion under § 2255 (Dkt. # 206) and brief in support (Dkt. # 207), defendant argues that his attorney, Matthew Cyran, was ineffective for 1) failing to raise certain arguments at the motion to suppress hearing; and 2) failing to present an adequate defense at trial.  Dkt. # 206, at 4,

5; Dkt. # 207, at 4-11.  In his first motion to amend (Dkt. # 218), defendant further argues that his due process rights were violated during his trial.  Dkt. # 218, at 2-6.  Specifically, defendant submitted, as an exhibit to the motion to amend, his codefendant, Cynthia Santagata's, affidavit (Dkt. # 218, at 9-10)--dated after defendant filed his § 2255 motion--and, based on her affidavit, alleges violations under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).  Id.  Additionally, defendant requests that, pursuant to Rule 7 of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Court grant his motion to expand the record (Dkt. # 220) in light of Santagata's affidavit.  Dkt. # 220, at 3.  Finally, defendant attempts to add three claims in his second motion to amend (Dkt. # 224): 1) his attorney Cyran was ineffective for not seeking dismissal of the indictment for multiplicitous charges; 2) Cyran was ineffective for not arguing for a lower sentence based on defendant's "extraordinary acceptance of responsibility" when he directed law enforcement officers to contraband during the March 2017 search of his residence; and 3) his rights under the Fifth Amendment were violated because plaintiff "sought and obtained an indictment on multiplicitous counts[.]"  Dkt. # 224, at 2-3.  Plaintiff responds that, as to defendant's § 2255 motion (Dkt. # 206), defendant is unable to "show deficient performance and prejudice[, which] is fatal to his ineffective assistance of counsel claim."  Dkt. # 210, at 23.  Plaintiff further responds that, as to defendant's motions based on Santagata's affidavit (Dkt. ## 218, 220), defendant "fails to provide adequate factual support for the motions[,]" which "conflict materially with the record before the Court."  Dkt. # 222, at 1.

## I.    Relevant Factual Background

In March 2017, Tulsa Police Department (TPD) narcotics officers executed a search warrant at defendant Darowe Junior Jones's residence.  Dkt. # 183, at 38.  Upon entering the residence, TPD

officers read defendant his <u>Miranda</u> rights and asked him if there was anything illegal inside of the house, to which defendant answered yes. <u>Id.</u> at 106-07. Additionally, defendant stated to TPD officers that he lived at the residence with his girlfriend, Cynthia Santagata. <u>Id.</u> During the March 2017 search, officers recovered numerous items of evidence, including a handgun, $16,218 in U.S. currency, 18 grams of cocaine, 116 grams of methamphetamine, 1.5 grams of heroin, digital scales, and plastic baggies. <u>Id.</u> at 30, 47-48, 52, 61, 69. Defendant was arrested that same day and subsequently released on bond. Dkt. # 184, at 145.

In February and April 2018, respectively, TPD officers searched the residences of codefendants Cherie Kelley and Dannie Dill. Dkt. # 183, at 30, 32. Officers recovered certain evidence, including approximately 150 grams of methamphetamine and at least 19 grams of heroin. <u>Id.</u> at 30-33.

In April 2018, after defendant and Santagata failed to appear in state court in connection with their March 2017 arrests, a state court judge issued fugitive arrest warrants for both defendant and Santagata. Dkt. # 100, at 1. Officer Joshua Ledbetter, an officer with the TPD fugitive warrants unit, began a fugitive investigation of defendant. <u>Id.</u> at 2. Ledbetter reviewed defendant's file, including photos of defendant, Santagata, and Santagata's sister, Camellia. <u>Id.</u> The file indicated that defendant drove a black 2007 GMC Yukon Denali, and Ledbetter also confirmed that Camellia drove a Hyundai Tucson. <u>Id.</u> After receiving a tip about defendant's location from TPD Officer Michael Cawiezell (who was working on the narcotics side of the investigation), Ledbetter drove by 3236 South 140th East Avenue in Tulsa, Oklahoma. <u>Id.</u> When Ledbetter drove by the residence, he observed a black 2007 GMC Yukon Denali parked in the driveway, which he believed belonged to defendant. <u>Id.</u> at 2-3. Ledbetter, intending to find and arrest defendant on the fugitive arrest

warrant, parked his car nearby and set up surveillance of the residence. Id. at 3. A few hours later, Ledbetter observed Camellia pull up to the residence in her Hyundai Tucson, and shortly thereafter, he observed Santagata back out of the garage in a black Chrysler 300, with Camellia in the passenger's seat. Id.

While other TPD officers proceeded to arrest Santagata for her outstanding felony warrant, Ledbetter continued his surveillance of 3236 South 140th East Avenue. Id. at 3-4. Residents of a nearby house confirmed that defendant drove the black 2007 GMC Yukon Denali, and that they had seen him pull up to the house earlier that morning. Id. at 4. At this point, Ledbetter believed he had enough information to confirm that defendant was inside the residence. Id. Officers surrounded the residence, and initially tried to enter through the garage using a garage door opener obtained from Santagata during her arrest. Id. When the officers entered the garage, they performed a protective sweep of the utility room, and looked inside a trash can to make sure no one was hiding in it. Id. The officers did not search in any area where a person could not fit, nor did they find or look for any evidence. Id. at 5. The officers then decided that it made more sense to enter through the front door, so they exited the garage and approached the front door. Id. The officers knocked on the front door and loudly announced their presence. Dkt. # 184, at 148. While the officers from the fugitive warrant unit were giving commands, Cawiezell noticed the smell of raw marijuana. Id. When no one answered the door, the officers decided to breach the front door and announced that they had a canine that they were going to release to get defendant into custody. Id. at 149. Defendant then walked out and surrendered himself. Id.

Once defendant was taken into custody, Cawiezell began the process of obtaining a search warrant based on the marijuana odor that he smelled outside the home. Dkt. # 100, at 5. While the

officers waited for the search warrant, they performed a protective sweep of the house.  Id.  The purpose of the protective sweep was to clear the residence of any persons or threats to officer safety--searching only places in which a person could hide--and did not include a search for any evidence.  Id.  Consequently, a Tulsa County judge signed the search warrant for "marijuana, instrumentalities used in the sale of marijuana, fruits and other controlled dangerous substances."  Dkt. # 85-3, at 1.  Cawiezell returned to the residence and the TPD officers executed the search warrant.  Dkt. # 100, at 7.  During the search, TPD officers recovered numerous items of evidence, including a firearm (Dkt. # 184, at 158), 178 grams of heroin, and 2 grams of methamphetamine (Dkt. # 183, at 31-32).

On June 4, 2018, a grand jury returned a 5-count indictment, charging defendant with being a felon in possession of a firearm and ammunition (count 1); and charging defendant and Santagata with drug conspiracy (count 2), possessing with intent to distribute heroin (count 3), possessing with intent to distribute marijuana (count 4), and maintaining a drug involved premises (count 5).  Dkt. # 2.  Defendant was arraigned in this Court and appointed counsel on June 12, 2018.  Dkt. # 23.  On August 8, 2018, a grand jury returned a 23-count superseding indictment, charging defendant, Santagata, Dill, and Kelley with various offenses, including drug conspiracy and maintaining a drug-involved premises.  Dkt. # 48.

On July 19, 2018, defendant filed a motion to suppress evidence, arguing that TPD officers executed a warrantless search on April 17, 2018, and that the fruits of said search should be suppressed.  Dkt. # 41, at 1.  Specifically, defendant argued that officers searched the residence after defendant was arrested but before they obtained a search warrant.  Id. at 3.  On September 14, 2018, the Court held a hearing as to defendant's motion to suppress.  Dkt. # 89.  Plaintiff proffered testimony from three law enforcement officers, including Ledbetter and Cawiezell.  Dkt. # 89-1, at

1.  The Court found that, "based on the credible testimony of the three officers, the officers did not conduct any search of the residence prior to obtaining the valid search warrant." Dkt. # 100, at 16. "Moreover, the search warrant was not obtained based on any evidence found while the officers were in the garage during the initial entry or protective sweep following Jones's arrest." Id. The Court denied defendant's motion to suppress. Id.

On September 28, 2018, Santagata entered into a plea agreement with plaintiff pursuant to Fed. R. Crim. P. 11(c)(1)(C). Dkt. # 102. Santagata entered a voluntary plea of guilty as to three counts: drug conspiracy (count 2), possession with intent to distribute methamphetamine (count 3), and possession with intent to distribute heroin (count 17). Id. at 1-2. Santagata initialed every page of the agreement, and confirmed that she read every part of the agreement and reviewed it with her attorney. Id. at 17. In exchange for Santagata's acceptance of responsibility as to the three counts included in the plea agreement, plaintiff "agree[d] to recommend a two-level reduction in offense level . . . [and] agree[d] to file a motion recommending that [Santagata] receive an additional one-level reduction[.]" Id. at 10. The agreement also states that Santagata "understands that the sentence to be imposed upon [her] will be determined solely by the sentencing judge." Id. at 13. The agreement stipulated that "the appropriate disposition in this case is a sentence of between 63 and 78 months' incarceration. This agreed upon sentencing range departs from the anticipated guideline calculation for the violations to which [Santagata] pled guilty." Id. at 13-14. The agreement further states that "[n]o agreements, representations or understandings have been made between the parties in this case, other than those which are explicitly set forth in this plea agreement and the [p]lea [a]greement [s]upplement[.]" Id. at 16. Finally, on the last page of the agreement, just above Santagata's signature, the document states, "[n]o other promises or inducements have been made to

[Santagata], other than those contained in this pleading. In addition, no one has threatened or forced [Santagata] in any way to enter into this agreement." Id. at 17. Moreover, the plea agreement supplement filed of record states that no cooperation agreement existed between Santagata and plaintiff. Dkt. # 103.

From October 22 to October 24, 2018, the Court presided over defendant Jones's jury trial. The parties entered into several stipulations prior to trial, which the Court read to the jury. Dkt. # 183, at 28-33. Specifically, the parties stipulated that certain evidence from the search of four residences (in which defendant and Santagata or Dill and Kelley resided, respectively) was properly recovered, transported, and stored . Id. The parties further stipulated that the evidence was weighed, analyzed, and tested positive for various substances, including cocaine, methamphetamine, and heroin, id., and the exact weight of each substance that was recovered and that said substances tested positive for either cocaine, methamphetamine, or heroin. Id.

During the jury trial, several law enforcement officers testified as to the evidence recovered from the searches of defendant and Santagata's and Dill and Kelley's residences. One officer testified that 1) the quantity of drugs found; 2) the different types of narcotics; 3) the digital scales; 4) the sandwich baggies; 5) the vacuum seal bags and machine; 6) the large amount of U.S. currency in different denominations; 7) the type of firearm (a pistol); and 8) the numerous cell phones, were all indicative of drug distribution. Id. at 71-72. Another law enforcement officer testified as to text message conversations between defendant and Santagata, in which the codefendants discussed making drug deals. Id. at 152. Cawiezell testified about the evidence recovered from the April 17, 2018 search, including large quantities of heroin, marijuana, and a firearm. Dkt. # 184, at 158-59, 164-65, 168. Cawiezell also testified as to residency paperwork that was entered into evidence,

which tied defendant to 3236 South 140th East Avenue and a second residence at 10946 East 61st Street.  Id. at 157.  The jury also heard jail calls made by defendant to his mother, who passed the phone to his codefendant Dill.  Id. at 199-200.  During the calls, defendant explained to Dill where he had hidden money in his house, and defendant also discussed whether law enforcement officers found heroin in the freezer during the April 17, 2018 search.  Id.  Finally, a law enforcement officer testified as to money transfers between June 8, 2016 and April 6, 2018, in the amount of approximately $100,000, from defendant and Kelley to individuals in California.  Id. at 134, 136.  The law enforcement officer further testified that defendant had not been gainfully employed since late 2015.  Id. at 136.

Defendant's girlfriend, Santagata, testified for plaintiff during his trial.  Dkt. # 184, at 74.  Santagata testified on direct examination that she pled guilty to several charges, including drug conspiracy, and admitted to participating in the drug conspiracy with defendant.  Id. at 77.  Santagata confirmed that she did not have a cooperation agreement with plaintiff, she was not hoping for a better result at sentencing in exchange for her testimony, and plaintiff had not indicated that Santagata would get a better result at sentencing in exchange for testifying.  Id. at 78.  During her testimony, Santagata confirmed the factual basis outlined in her plea agreement as to the drug conspiracy and possession with intent to distribute certain controlled substances, including methamphetamine and heroin.  Compare Dkt. # 184, at 79-85 (trial testimony), with Dkt. # 102, at 8-9 (plea agreement).  Santagata further confirmed that, as to the charged offenses to which she pled guilty, defendant was her coconspirator.  Dkt. # 184, at 85.  During cross-examination, Santagata admitted that she was looking at a lengthy prison sentence, and that her plea agreement, if accepted, ensured a guaranteed sentence of 63-78 months, which was a more favorable disposition than the

guideline range for the charged offenses in the superseding indictment.  Id. at 93.  Santagata subsequently admitted that she did not want to be testifying, but that she "kn[e]w" that she "ha[d] to be" to "keep that [plea] deal[.]"  Id. at 94.  On redirect, Santagata confirmed that 1) her plea agreement did not require her to testify; 2) she voluntarily agreed to every part of the plea agreement; and 3) she read and understood every part of the agreement.  Id. at 95-96.

Additionally, plaintiff's cooperating witness, codefendant Kelley, testified at defendant's trial.  Id. at 97-99.  Kelley testified that she conspired with defendant, Santagata, and Dill to distribute methamphetamine and heroin.  Id. at 98.  Kelley further testified that she, along with codefendant Dill, purchased methamphetamine and heroin for distribution from defendant.  Id. at 100, 102.  Crucially, Kelley testified that the heroin and methamphetamine that was recovered during the February and April 2018 searches of her and Dill's residences came from defendant and that defendant was her and Dill's sole supplier at that time.  Id. at 119-20.  Kelley also confirmed that she was sending money transfers on behalf of defendant to individuals in California in exchange for drugs.  Id. at 108.

During deliberations, the jury sent two questions to the Court: first, whether the jury could review the evidence/property list from each search; and second, whether one of the substances listed in the parties' stipulations was MDMA.  Dkt. # 185, at 101, 103.  The Court read both questions in open court with defendant and counsel present and, outside the presence of the jury, proposed an answer to each question, and asked plaintiff and defense counsel if there were any objections, to which both counsel responded that they had no objection.  Id. at 103-04.  Specifically, the Court confirmed with both parties that the evidence/property lists were not in evidence, and responded to the jury's first question that "the property lists are not in evidence; the items of evidence recovered

are." Id. at 101-03.  Next, the Court asked both counsel whether they agree that MDMA was not included in the parties' stipulations, and, after both counsel agreed, the Court responded to the jury's second question in the negative.  Id. at 103-04.  Consequently, after considering all of the evidence, the jury convicted defendant of all 15 counts.  Id. at 106-11.

On February 7, 2019, the Court held a sentencing hearing for Santagata.  Dkt. # 164.  Prior to the hearing, plaintiff filed a motion for a sentence below the statutory minimum and for a downward departure of five offense levels from the advisory guideline offense level.  Dkt. # 159, at 1.  Plaintiff stated that Santagata had provided substantial assistance to plaintiff in the investigation and prosecution of others.  Id.  Plaintiff reiterated that Santagata did not have a cooperation agreement, yet she still provided impactful testimony against defendant at his trial.  Id. at 2-3.  The Court found that a downward departure was warranted and justified, based upon the substantial assistance Santagata provided, and sentenced Santagata to 41 months.  Dkt. # 164.

On February 27, 2019, the Court held a sentencing hearing for defendant.  Dkt. # 168.  Prior to sentencing, the U.S. Probation Office prepared a presentence investigation report (PSR).  The PSR was subsequently revised before sentencing, and plaintiff and defendant each filed objections to the revised PSR.  Dkt. # 186, at 28-35 (transcript of sentencing hearing).  Plaintiff made four objections to the PSR, three of which were based on the PSR's findings that certain sentencing enhancements are inapplicable.  Id.  The Court did not consider the merits of the fourth objection, which was untimely filed.  Id. at 35.  The Court overruled plaintiff's other three objections to the PSR.  Id. at 31-35.  Additionally, defendant objected to the PSR based on the total amount of drugs attributable to him and accounted for in the guideline calculation.  Id. at 35.  Defendant argued that his drug amounts were inappropriately enhanced by 160.26 grams of methamphetamine and 18.77 grams of

10

heroin that were recovered from the February and April 2018 searches of Kelley and Dill's residences.  Id.  The Court found that, based on Kelley's credible testimony at trial, defendant was accountable for the drug quantities that were properly included in the PSR, and overruled defendant's objection.  Id. at 36.  The Court sentenced defendant to a total of 211 months imprisonment.  Dkt. # 168.

On March 7, 2019, defendant appealed the judgment to the Tenth Circuit Court of Appeals. Dkt. # 172.  Defendant argued that "the evidence [did] not support a finding that he possessed [a] 9mm pistol 'in furtherance of' his drug crimes . . . [and] that the district court abused its discretion by imposing a substantively unreasonable sentence."  Dkt. # 202, at 4.  In its February 4, 2020 opinion, the Tenth Circuit noted that defendant "[did] not contest his conviction for possessing a firearm on March 20, 2017.  Nor does he contest his convictions for conspiracy and possessing, with intent to distribute methamphetamine, heroin, cocaine, and marijuana in the house where officers located the firearm."  Id. at 5.  "The only issue remaining is whether [defendant] possessed the firearm in furtherance of either the conspiracy or the substantive crimes of possession with intent to distribute."  Id.  On the subject of Santagata's trial testimony, defendant argued that her testimony was ambiguous.  Id. at 7.  The Tenth Circuit acknowledged that it appeared that Santagata testified reluctantly; however, "even if this testimony were discounted or ignored, a reasonable juror could have concluded that [defendant] possessed the firearm in furtherance of his drug trafficking crimes based on the remaining evidence presented."  Id. at 7-8.  Further, that court found that defendant "concede[d] that the district court 'correctly calculated the applicable Guidelines range' and sentenced him to the low end of that range."  Id. at 8.  In sum, the Tenth Circuit affirmed defendant's conviction, finding that 1) there was enough evidence to convict for possession of a firearm in

furtherance of a drug trafficking crime; and 2) the sentence imposed by the district court was reasonable.  Id. at 7-8. 9-10.

On May 11, 2020, defendant timely filed his motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255.  Dkt. # 206.  Defendant argues that his attorney Cyran was ineffective for 1) failing to raise certain arguments at the motion to suppress hearing; and 2) failing to present an adequate defense at trial.  Dkt. # 206, at 4, 5; Dkt. # 207, at 4-11.  On December 22, 2020, defendant filed his first motion to amend, arguing that his due process rights were violated during his trial. Dkt. # 218, at 2-6.  In support of his first motion to amend, defendant submitted an affidavit signed by Santagata (Dkt. # 218, at 9-10)--dated after defendant filed his § 2255 motion--and alleges Brady and Giglio violations based on her affidavit.  Id.  Specifically, Santagata's November 23, 2020 affidavit states that "[i]t was part of [her plea] agreement to sign the deal before [her] co-defendant, Darowe Jones' trial."  Id. at 10.  Santagata further affirmed that she "felt like [she] had no other choice," and Santagata knew that plaintiff "used [her] sister, Camellia Santagata as a scare tactic to make [her] plead guilty to the said charges."  Id.  Finally, Santagata affirmed that "[i]n exchange for a downward departure from the government, [she] agreed to provide information to [plaintiff]."  Id. On March 8, 2021, defendant moved to expand the record arguing that Santagata's affidavit constituted "exculpatory evidence."  Dkt. # 220.  Finally, on February 14, 2022, defendant filed a second motion to amend,  adding three claims: 1) his attorney Cyran was ineffective for not seeking dismissal of the indictment for multiplicitous charges; 2) Cyran was ineffective for not arguing for a lower sentence based on defendant's "extraordinary acceptance of responsibility" when he directed law enforcement officers to contraband during the March 2017 search of his residence; and 3) his

rights under the Fifth Amendment were violated because plaintiff "sought and obtained an indictment on multiplicitous counts[.]"  Dkt. # 224, at 2-3.

## II.      Defendant's First (Dkt. # 218) and Second (Dkt. # 224) Motions to Amend

As a preliminary matter, there is a one-year statute of limitations for filing a motion under § 2255(f), which states, in pertinent part, "[t]he limitation period shall run from the latest of" 1) "the date on which the judgment of conviction becomes final"; or 2) "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."  Here, defendant's judgment of conviction became final on May 4, 2020, 90 days after the Tenth Circuit's affirmance of his conviction on appeal (Dkt. # 202). See United States v. Burch, 202 F.3d 1274, 1276 (10th Cir. 2000) (holding that, as to the limitations period beginning to run for filing a § 2255 motion, "if a defendant does not petition the United States Supreme Court for a writ of certiorari after [his] direct appeal, [his] judgment of conviction is final after the time for seeking certiorari review has expired"); see also U.S. Sup. Ct. R. 13 ("a petition for a writ of certiorari to review a judgment in any case . . . [entered by] a United States court of appeals . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment").  Thus, defendant's deadline to file his § 2255 was May 4, 2021.

On May 11, 2020, defendant timely filed his motion under § 2255 (Dkt. # 206).  On December 22, 2020, defendant filed his first motion to amend (Dkt. # 218), in which he asserts a new ground for relief based on alleged due process violations.  While his § 2255 motion and first motion to amend were still pending, defendant filed a motion to expand the record (Dkt. # 220) on March 8, 2021.  After the expiration of his one-year limitations period, defendant filed a second motion to amend (Dkt. # 224) on February 4, 2022.  Defendant's motion to expand the record references his

first motion to amend (Dkt. # 218) and restates the due process violations asserted therein.  Dkt. # 220, at 2-5.  Defendant's second motion to amend (Dkt. # 224) alleges two new ineffective assistance claims and a new prosecutorial misconduct claim.  Dkt. # 224, at 2-4.

Rule 2 of the Rules Governing Section 2255 Proceedings sets forth the requirements for stating a claim.  "The habeas rule instructs the petitioner to 'specify all grounds for relief available to [him]' and to 'state the facts supporting each ground.'"  Mayle v. Felix, 545 U.S. 644, 649 (2005).  "By statute, Congress provided that a habeas petition 'may be amended . . . as provided in the rules of procedure applicable to civil actions.'"  Id.  Accordingly, Fed. R. Civ. P. 15 states that a party may amend its pleading once without leave of the Court if 1) the amendment is filed within 21 days after serving the initial pleading; or 2) if a responsive pleading was required, within 21 days after a responsive pleading is served.  Fed. R. Civ. P. 15(a)(1).  In all other cases, as here, a petitioner "may amend a [§ 2255 motion] only with . . . the court's leave."  Fed. R. Civ. P. 15(a)(2).  Additionally, "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading[.]"  Fed. R. Civ. P. 15(c)(1)(B).  Finally, "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.  The court may permit supplementation even though the original pleading is defective in stating a claim or defense."  Fed. R. Civ. P. 15(d).

Here, defendant alleges that he received new evidence (Santagata's affidavit)--that was not available to him at the time that he filed his § 2255 motion--which forms the basis of his new due process violation claim raised in his first motion to amend (Dkt. # 218).  Defendant filed his first

14

motion to amend on December 22, 2020, approximately five months after he timely filed his original pleading and within his one-year limitations period; notwithstanding, plaintiff had an opportunity to respond, and did respond, to the allegations based on the Santagata affidavit contained therein, see Dkt. # 222.  Accordingly, the Court finds that defendant's first motion to amend (Dkt. # 218) is better understood as a motion to supplement his § 2255 motion, which shall be granted.  Therefore, the Court will consider the new ground for relief raised in defendant's supplemental motion as part of his § 2255 motion (Dkt. # 206).

Defendant's second motion to amend (Dkt. # 224)--filed on February 14, 2022, approximately nine months after the limitations period expired--raises completely new claims, based on allegations of 1) prosecutorial misconduct and ineffective assistance of counsel as to multiplicitous counts in the indictment, and 2) defense counsel's failure to emphasize at sentencing defendant's acceptance of responsibility during the March 2017 search of his residence.  Dkt. # 224, at 2-5.  These untimely, new claims do not relate back to the initial § 2255 motion, as they do not arise from any transaction, occurrence, or event that defendant set out or attempted to set out in the original pleading.  Thus, the Court finds that defendant's second motion to amend (Dkt. # 224) should be treated as a second or successive motion.

Under § 2255(h), a defendant is permitted to file a second or successive § 2255 motion based on claims of:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
>
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h).  Notwithstanding, "[a] district court does not have jurisdiction to address the merits of a second or successive § 2255 or 28 U.S.C. § 2254 claim until [the Tenth Circuit] has granted the required authorization."  In re Cline, 531 F.3d 1249, 1251 (10th Cir. 2008).  The Tenth Circuit has determined that "[w]hen a second or successive § 2254 or § 2255 claim is filed in the district court without the required authorization from this court, the district court may transfer the matter to this court if it determines it is in the interest of justice to do so under § 1631, or it may dismiss the motion or petition for lack of jurisdiction."  Id. at 1252.  Citing Trujillo v. Williams, 465 F.3d 1210, 1223 n.16 (10th Cir. 2006), the Tenth Circuit stated that "[f]actors considered in deciding whether a transfer is in the interest of justice include whether the claims would be time barred if filed anew in the proper forum, whether the claims alleged are likely to have merit, and whether the claims were filed in good faith or if, on the other hand, it was clear at the time of filing that the court lacked the requisite jurisdiction."  In re Cline, 531 F.3d at 1251.  "Where there is no risk that a meritorious successive claim will be lost absent a § 1631 transfer, a district court does not abuse its discretion if it concludes it is not in the interest of justice to transfer the mater to this court for authorization."  Id. at 1252 (citing Phillips v. Seiter, 173 F.3d 609, 610 (7th Cir. 1999) (noting that it is a waste of judicial resources to require the transfer of frivolous, time-barred cases).

Here, the Court lacks jurisdiction to address the merits of defendant's second or successive motion because it was filed in the district court without the required authorization from the Tenth Circuit.  Further, the Court finds that defendant's claims are unlikely to have merit because they are not based on newly discovered evidence or a new rule of constitutional law.  Defendant's claims are based on his indictment and defense counsel's conduct during sentencing.  Any evidence based on either of these two issues would have been available to defendant both at the time of his appeal and

at the time of filing his § 2255 motion.  Moreover, defendant cites to no new rule of constitutional law that would have a bearing on his claims.  Therefore, the Court finds that defendant's second motion to amend (Dkt. # 224) should be dismissed for lack of jurisdiction.

### III.    Defendant's Motion to Vacate, Set Aside, or Correct Sentence (Dkt. # 206)

Defendant moves, pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct sentence based on the following grounds:

### a.    Ineffective Assistance of Counsel

Defendant argues that his attorney, Matthew Cyran, was ineffective because he 1) did not make certain arguments at the motion to suppress hearing; 2) failed to challenge evidence of drug quantities that were not stipulated to by the parties; 3) failed to adequately cross-examine plaintiff witness Cherie Kelley as to proof of certain drug and financial transactions; 4) did not call defendant's friends and relatives to testify as character witnesses at trial;  and 5) failed to challenge the Court's response to certain questions asked by the jury during deliberations.  Dkt. # 207, at 4-11; Dkt. # 206, at 4-5.

To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance was prejudicial.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993). A defendant can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases.  Strickland, 466 U.S. at 687-88. There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." Id. at 688.  In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

17

conduct." Id. at 690.  Moreover, review of counsel's performance must be highly deferential.  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689.

To establish the second prong, a defendant must show that counsel's deficient performance prejudiced the defendant to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).   In Glover v. United States, 531 U.S. 198, 199 (2001), the Supreme Court held that "any amount of actual jail time has Sixth Amendment significance."  Thus, the prejudice prong of the Strickland test does not require that any increase in sentence must meet a standard of significance.  See United States v. Horey, 333 F.3d 1185, 1187-88 (10th Cir. 2003).

1.   Suppression Hearing

Defendant argues that Cyran was ineffective for failing to argue at the suppression hearing that 1) law enforcement officers performed a warrantless search of the trash at the residence; and 2) defendant was a guest at the residence, and "police may not search for the subject of an arrest warrant in the home of a third party absent a search warrant or exigent circumstances." Dkt. # 207, at 4-6.

The Court finds that defense counsel's performance was not deficient at the suppression hearing.  Crucially, in its response to defendant's § 2255 motion (Dkt. # 210), plaintiff submitted as an exhibit Cyran's affidavit regarding his representation of defendant. Dkt. # 210-1.  Cyran affirmed that, prior to filing defendant's motion to suppress, plaintiff produced a document confirming that

18

defendant was a resident of 3236 South 140th East Avenue, which was the subject address in the search relevant to the motion to suppress. Id. at 2. Cyran stated that he went to the TPD property room to review and photograph the document, which was a commercial invoice for repair work performed on defendant's vehicle. Id. at 2-3. Notwithstanding, Cyran filed a motion to suppress, arguing that law enforcement officers conducted a warrantless search of the garage and residence and any fruits therefrom should be suppressed. Dkt. # 41, at 3-4. The Court held a suppression hearing and found credible the testimony of several law enforcement officers who testified that, after gathering sufficient information to believe that defendant was inside the residence, they entered the garage and conducted a protective sweep, including a search of a trash bin in which a person could hide. As the officers approached the residence, Officer Cawiezell detected the odor of marijuana. Accordingly, after the officers executed the arrest warrant, Cawiezell applied for a search warrant, and the officers waited for a search warrant to be issued by a magistrate. While the officers were waiting, they conducted a protective sweep of the residence, only searching in places that could hide a person. In its September 27, 2018 opinion and order, the Court noted that, according to the Supreme Court, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Dkt. # 100, at 14 (citing Payton v. New York, 445 U.S. 573, 603 (1980)) (internal quotations omitted). The Court further noted the Supreme Court's decision in Maryland v. Buie, 494 U.S. 325, 337 (1990), which held that "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an

individual posing a danger to those on the arrest scene." (Internal quotations omitted). The Court found that the officers were justified in conducting a protective sweep of the home.

Notably, Cyran made arguments in the motion to suppress (Dkt. # 41) that were largely identical to those raised by defendant in his § 2255 motion. Compare Dkt. # 207, at 5-7, with Dkt. # 41, at 3-4. The only discernible difference, between the arguments contained in the motion to suppress and defendant's § 2255 motion, is that defendant argues in the § 2255 motion that he was a guest in the home. However, even assuming, arguendo, that defendant was a guest at the searched residence, this proves fatal to any claims of Fourth Amendment violations. In order to suppress evidence due to a Fourth Amendment violation, a defendant must first "demonstrate that it was his Fourth Amendment rights that were violated." United States v. Davis, 750 F.3d 1186, 1189 (10th Cir. 2014).[1] If defendant were a guest at a third party's residence, then searching for the subject of an arrest warrant or a warrantless search of the trash--at a third party's residence–would violate the Fourth Amendment rights of the third party, not defendant. In other words, defendant does not have standing to assert Fourth Amendment violations based on facts where a third party's residence was entered to execute an arrest warrant, or a third party's trash was searched without a warrant. In sum, the Court finds that defendant is unable to show deficient performance as to the motion to suppress.

---

[1]     The Tenth Circuit has often referred to this concept as "standing." See, e.g., United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009). The Supreme Court has disapproved of referring to this concept as "standing," stating that it "is more properly subsumed under substantive Fourth Amendment doctrine." Rakas v. Illinois, 439 U.S. 128, 139 (1978); see also Minnesota v. Carter, 525 U.S. 83, 87-88 (1998). While recognizing the Supreme Court's pronouncements and discussing the issue as part of its substantive analysis of the Fourth Amendment, the Tenth Circuit has continued to refer to the concept as "standing." See, e.g., United States v. Ocegueda, 605 F. App'x 719, 722 (10th Cir. 2015); Davis, 750 F.3d at 1190. This opinion and order will follow the Tenth Circuit's practice and refer to this concept as "standing."

Cyran's decision not to argue that defendant was a guest at the searched residence was reasonable, and he did argue that law enforcement officers conducted a warrantless search of the trash. Because defendant fails the first prong, the Court need not reach the second prong.

2.    Drug Quantities

Defendant argues that Cyran was ineffective for failing to prevent defendant from being held responsible for "drug amounts that were not his." Dkt. # 206, at 5; Dkt. # 207, at 8. Specifically, defendant argues that Cyran failed to file a motion in limine "solidify[ing] the drug amount stipulated to" for which defendant could be held accountable. Dkt. # 207, at 8.

Defendant's argument is premised on his understanding that, before trial, the parties "stipulated to a certain drug amount that [defendant] was responsible for." Id. at 8. However, defendant's argument is misguided. The stipulations that the Court read to the jury--as to drugs recovered from the searched residences--made no mention of what quantities defendant was responsible for. Dkt. # 183, at 29-33. Rather, the parties stipulated that all items from the four searched residences were properly recovered, transported, and stored. Id. The parties further stipulated that various items were tested by a TPD chemist, and the parties stipulated 1) that certain recovered items tested positive for cocaine, methamphetamine, or heroin; and 2) to the respective weights of the tested substances. Id. Additionally, Cyran states in his affidavit that

> none of the stipulations purported to limit Mr. Jones's exposure at sentencing. . . . Stipulating to drug weights and tests was discussed at length with Mr. Jones. Mr. Jones contended that the drugs were not his and he did not have anything to do with them. [Cyran] advised him that if that was going to be the defense at trial, then it would appear disingenuous to a jury if [defendant] contested anything about the drugs. . . . Mr. Jones agreed with this strategy. At no time did [Cyran] tell Mr. Jones that the stipulations would limit the total drug weight he might face at sentencing. This would have made no sense, considering the stipulations about the drugs did not reference Mr. Jones or attribute the drugs to Mr. Jones or anyone else.

21

Dkt. # 210-1, at 4.  The Court finds that defendant is unable to show deficient performance. Defendant entered a plea of not guilty to various charges in the superseding indictment, including possession with intent to distribute methamphetamine, cocaine, heroin, and marijuana (counts 3, 4, 5, 6, 17, 18), as well as maintaining a drug involved premises (counts 8, 19).  Dkt. # 48.  It would be nonsensical for defendant to enter into a stipulation to a certain drug quantity that he was responsible for, as that would effectively concede guilt.  Accordingly, Cyran's conduct was reasonable, considering that contesting the drug quantities in the stipulations would contradict defendant's position that he had no knowledge of the drugs that were recovered from the searched residences.

Moreover, defendant argues that Cyran was deficient for not arguing, in his objection to the PSR at sentencing, that plaintiff's cooperating witness, codefendant Kelley, is unable to corroborate her testimony connecting defendant to "additional drugs[.]" Dkt. # 207, at 8-9.  As a result, defendant argues, these additional drug quantities increased his sentencing guideline range under U.S.S.G. § 1B1.3(a)(1)(A).  Id. at 8.  However, at defendant's sentencing, the Court addressed defendant's argument that "his drug amounts were inappropriately enhanced[.]" Dkt. # 186, at 35 (sentencing hearing transcript).  The Court noted that "Kelley testified under oath at trial that the 160.26 grams of methamphetamine and 18.77 grams of heroin found on February 21, 2018 and April 19, 2018, were supplied by Jones . . . .  Consistent with the jury findings, the [C]ourt finds that Kelley was credible and her testimony was truthful." Id.  Thus, defense counsel did make the relevant objection to the PSR, which the Court addressed at sentencing.  Insofar as defendant argues that Cyran was deficient for not challenging Kelley's testimony during cross-examination, the Court will address that argument below.

3.      Codefendant Kelley's Cross-Examination

Defendant argues that Cyran was deficient for failing to insist that plaintiff's cooperating witness, codefendant Kelley, corroborate her testimony linking defendant to the drugs recovered from Kelley and Dill's residences.  Dkt. # 207, at 9.  The Court finds that defendant is unable to show deficient performance.

Cyran affirms that he "did not believe a line of questioning about whether Ms. Kelley personally retained any records of the financial transactions or packages of drugs would serve Mr. Jones's best interests.  First, [Cyran] knew that the government had actually obtained records" corroborating codefendant Kelley's testimony, and "[s]econd, [Cyran] believed the jurors would find it implausible that someone like Cherie Kelley, a long-time drug user and sometime drug dealer, would keep such records."  Dkt. # 210-1, at 6.  Cyran further affirmed that, in preparation for Kelley's cross-examination, he reviewed her history of drug abuse and criminal history and cross-examined her about that history at trial.  Id. at 5.  Additionally, Cyran cross-examined Kelley about the charges pending against her, her plea deal and cooperation agreement, as well as prior statements she had made to plaintiff that she primarily got her drugs from codefendant Dill, not Jones.  Id.  As the Court pointed out at sentencing, the jury found credible Kelley's testimony that the drugs recovered from her residences were supplied by defendant, and defendant was her sole supplier at that time.  Dkt. # 186, at 35.  The Court agrees with Cyran that it is implausible that Kelley, a drug user and sometime drug dealer, would keep meticulous records of various drug transactions.  Moreover, Cyran affirmed that he was aware that plaintiff had financial records corroborating Kelley's testimony that would be introduced through a financial analyst witness.  Dkt. # 210-1, at

23

6.  In sum, the Court finds that Cyran acted reasonably in deciding what points to emphasize during Kelley's cross-examination.

        4.        *Character Witnesses*

Defendant argues that Cyran failed to present an adequate defense by making "virtually no investigation [into] . . . obtaining testimony from [defendant's] relatives, or other persons in his life pertaining to [defendant's] character and background[.]" Dkt. # 207, at 10. Defendant asserts that, had Cyran called such character witnesses, they would be "willing and able to testify that, in their experience, [defendant] never used a gun in furtherance of any crime, that all of his problems stemmed from his own personal drug usage, and that if given a chance, with drug rehab, [defendant] would be a responsible non-violent man[.]" Id. However, Cyran affirmed that

> in the jail calls [plaintiff] produced, Mr. Jones routinely talked to friends and family, including his mother, about his involvement with drug distribution. Calling any of those individuals as witnesses would have subjected them to potentially damaging cross examination, to Mr. Jones's detriment. Any other friends or acquaintances of Mr. Jones were already testifying against him.

Dkt. # 210-1, at 5. The Court finds that Cyran's decision not to call character witnesses was reasonable. Specifically, based on the jail calls that plaintiff produced, it was reasonable for Cyran to conclude that calling defendant's relatives and friends would be detrimental to him at trial--any such witness would be subject to cross-examination regarding their conversations with defendant about drug distribution.

        5.        *Answers to Jury Questions*

Defendant argues that Cyran was deficient for failing to object to the Court's answers to two questions submitted by the jury during deliberation. Dkt. # 207, at 11. The jury asked 1) whether it could review the evidence/property list from each search, and 2) whether the parties' stipulations

as to the substances recovered from the searched residences included MDMA.  Dkt. # 185, at 101, 103.  The Court, after conferring with plaintiff and defense counsel and asking whether there were any objections, answered the jury's questions based on the agreed upon facts.  Specifically, the Court confirmed with counsel that the property/evidence list had not been entered into evidence, and responded to the jury's first question that "the property lists are not in evidence; the items of evidence recovered are."  Id. at 101-03.  Next, the Court confirmed with counsel that the joint stipulations did not include MDMA, and responded to the jury's second question in the negative, after plaintiff and defense counsel were in agreement with--and had no objection to--the Court's response.  Id. at 103-04.  The Court finds that Cyran was reasonable in not objecting to the Court's answers, because the Court correctly answered the jury's factual questions--the property list was not entered into evidence and the parties did not stipulate to any substances testing positive for MDMA. Thus, defendant is unable to show deficient performance.

b.      Due Process Claim

Defendant argues that plaintiff violated his due process rights, under Brady and Giglio, because it "presented false testimony from its witness Cynthia Santagata . . . [and] failed to correct such falsehood as it was being presented."  Dkt. # 218, at 3-4.  Specifically, based on Santagata's affidavit, defendant alleges that 1) Santagata falsely testified about not have a cooperation agreement and not expecting to get some sort of benefit in exchange for her testimony; and 2) plaintiff failed to disclose the cooperation agreement and failed to correct or expose Santagata's false testimony. Id. at 4-5.  As a result, defendant argues, the jury did not hear evidence bearing on Santagata's credibility and bias, and "such evidence could have cast doubt and could have altered the outcome." Id. at 6.

25

The suppression of evidence material to either guilt or punishment violates due process, regardless of the good faith of the prosecutor. Brady, 373 U.S. at 87.  Where a prosecution witness's testimony could determine a defendant's guilt or innocence, evidence that could be used to impeach that witness cannot be suppressed without violating due process. Giglio, 405 U.S. at 154.  "In order to establish a *Brady* or *Giglio* violation, 'the defendant bears the burden of establishing (1) that the prosecution suppressed the evidence, (2) that the evidence was favorable to the accused, and (3) that the evidence was material.'"   United States v. Gonzalez-Montoya, 161 F.3d 643, 649 (10th Cir. 1998) (quoting Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 824 (10th Cir. 1995)).

"[T]he criterion of materiality is met only if there is a 'reasonable probability' that the outcome of the trial would have been different had the evidence been disclosed to the defense." Id. (citing United States v. Bagley, 473 U.S. 667, 682 (1985)); see also Kyles v. Whitley, 514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence").  Courts must "consider the significance of the suppressed evidence in relation to the entire record." Id. at 650.  "[W]here a prosecuting witness is not key to the government's case, his credibility is not material; hence the failure to reveal impeachment evidence concerning a minor witness does not violate *Brady*."   United States v. Buchanan, 891 F.2d 1436, 1444 (10th Cir. 1989).  A witness is key, or critical, if he is the only link between the accused and the crime, United States v. Torres, 569 F.3d 1277, 1283 (10th Cir. 2009); see also Nuckols v. Gibson, 233 F.3d 1261, 1266 (10th Cir. 2000), or if he is "indispensable," Douglas v. Workman, 560 F.3d 1156, 1175 (10th Cir. 2009), or "essential." United States v. Robinson, 583 F.3d 1265, 1271 (10th Cir. 2009).  By contrast, a witness is not critical where the

26

witness's testimony is duplicated by other witnesses, United States v. Cooper, 654 F.3d 1104, 1123 (10th Cir. 2011) ("A review of the evidence here demonstrates that Mr. Gleason—although an important witness—was not a crucial or critical witness to the government's case because several other co-conspirators provided commensurate testimony" (emphasis omitted)); where the other available evidence is "overwhelming," United States v. Smith, 534 F.3d 1211, 1223 (10th Cir. 2008); or where the witness's testimony provides relevant background information but does not squarely address the defendant's guilt or innocence.   United States v. Reese, 745 F.3d 1075, 1088-89 (10th Cir. 2014) (finding not critical the testimony of a witness who explained how an investigation began but who did not testify about defendants' involvement).

Here, defendant fails the first prong--that plaintiff suppressed the evidence.  Turning to Santagata's affidavit, she does not state in the affidavit that she falsely testified at trial.  Dkt. # 218, at 10.  She does state that "[i]t was part of the [plea] agreement to sign the deal before [her] co-defendant, Darowe Jones' trial[.]"  Id.  Accordingly, the Court has reviewed Santagata's plea agreement, and notes that Santagata initialed every page of the agreement, and confirmed that she read every part of the agreement and reviewed it with her attorney.  Dkt. # 102, at 17.  Crucially, the agreement makes no mention of requiring Santagata to sign the plea agreement before defendant's trial, or to testify at his trial.  The agreement also states that Santagata "understands that the sentence to be imposed upon [her] will be determined solely by the sentencing judge[,]" id. at 13; that is, plaintiff does not have the authority to grant Santagata a downward departure--that authority rests solely with the sentencing judge.  The agreement further states that "[n]o agreements, representations or understandings have been made between the parties in this case, other than those which are explicitly set forth in this plea agreement and the [p]lea [a]greement [s]upplement[.]"  Id. at 16.

Moreover, on the last page of the agreement, just above Santagata's signature, the document states, "[n]o other promises or inducements have been made to [Santagata], other than those contained in this pleading.  In addition, no one has threatened or forced [Santagata] in any way to enter into this agreement."  Id. at 17.  Finally, the plea agreement supplement filed of record states that no cooperation agreement existed between Santagata and plaintiff.  Dkt. # 103.

The Court finds that, based on a review of the plea documents, it was not part of Santagata's plea agreement to testify at Jones's trial, and there was no cooperation agreement between Santagata and plaintiff.  The documents filed of record demonstrate that no formal cooperation agreement existed and Santagata confirmed with her signature that she understood that 1) no cooperation agreement existed; 2) no agreements have been made between Santagata and plaintiff other than the ones explicitly set forth in her plea agreement; and 3) the sentence imposed on her will be determined solely by the sentencing judge (which would include any downward departure).  In sum, the Court finds that 1) Santagata did not state in her affidavit that she provided false testimony at trial, and 2) the plea documents show that no cooperation agreement existed, and plaintiff did not agree to provide any benefit to Santagata (other than what was explicitly set forth in the plea agreement).  Therefore, defendant is unable to establish that plaintiff suppressed evidence as to Santagata's alleged cooperation.

Even if defendant could satisfy the first two prongs, he is unable to establish the third prong-- that the alleged suppressed favorable evidence was material.  Based on the overwhelming evidence presented against him at trial, defendant is unable to show that there is a reasonable probability that any alleged evidence of Santagata cooperating with plaintiff would have changed the outcome.  For example, numerous law enforcement officers testified at trial that they recovered large quantities of

drugs and currency, digital scales, plastic baggies, and two firearms from defendant's searched residences.  Defendant was present at two of the searched residences where officers recovered such evidence.  The law enforcement officers testified as to why the totality of the circumstances led them to associate the evidence recovered at Jones's residences with drug distribution behavior.  Moreover, codefendant Kelley, a cooperating witness, testified that all of the drugs recovered from her house were from defendant and that defendant was her sole supplier.  Thus, based on a plethora of compelling evidence against defendant, it is highly improbable that--were the jury to learn that Santagata was a cooperating witness receiving a benefit in exchange for her testimony--they would change their findings that defendant was guilty of the charged offenses.

In sum, the Court finds that defendant's motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 (Dkt. # 206) should be denied.

## IV.   Defendant's Motion for Leave to Expand the Record (Dkt. # 220)

On March 8, 2021, defendant filed a motion that, in title, requested leave to expand the record as to his § 2255 motion.  However, despite stating the legal standard for expanding the record under Rule 7 of the Rules Governing § 2255 Proceedings, the substance of defendant's motion merely restates arguments as to his alleged due process claim based on Santagata's affidavit. The Court found, in Part III.b, supra, that defendant failed to establish a due process violation based on Santagata's affidavit.  Therefore, the Court finds that defendant's motion for leave to expand the record (Dkt. # 220) should be denied.

**IT IS THEREFORE ORDERED** that defendant's motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 (Dkt. # 206) is **denied**.  A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that defendant's first motion to amend (Dkt. # 218) is **granted** as to permitting defendant to supplement his § 2255 motion to vacate, set aside, or correct sentence.

**IT IS FURTHER ORDERED** that defendant's second motion to amend (Dkt. # 224) is **dismissed for lack of jurisdiction**. A separate judgment of dismissal is entered herewith.

**IT IS FURTHER ORDERED** that defendant's motion for leave to expand the record (Dkt. # 220) is **denied**.

**DATED** this 26th day of August, 2022.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE